JUDGE COTE 10 CV 5196

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RESPONSE PERSONNEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD FIRE INSURANCE CO.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

RECEIVED JUL - 8 2010 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Response Personnel, Inc. ("RPI"), by and through its undersigned counsel, Kissel Hirsch & Wilner, LLP, hereby files this complaint against Hartford Fire Insurance Co. ("Hartford") and alleges as follows:

**THE PARTIES**

1. RPI was and is a corporation organized under the laws of the state of New York with its principal offices located at 10 East 40th Street, 5th Floor, New York, New York.

2. Upon information and belief, Hartford is and was a "specially chartered" corporation organized under the laws of the State of Connecticut with its principal offices located at One Hartford Plaza, T-4, Hartford, Connecticut.

**BASIS FOR JURISDICTION**

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. RPI is a citizen of the State of New York. Upon information and belief, Hartford is a citizen of the State of Connecticut. The amount in controversy exceeds $75,000.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred within this district.

**THE POLICY**

5. Hartford provided a CrimeSHEILD Policy for Mercantile Entities to RPI as the "Named Insured" bearing policy number 10 FA 0235439-06 (the "Policy"). A copy of the Policy is attached hereto as Exhibit A, and its terms are incorporated as if set forth fully herein.

6. The Policy was initially in effect for the period July 31, 2006 until cancelled.

7. By way of endorsement, the Policy Period was changed to July 31, 2006 to July 31, 2007.

8. By way of a renewal endorsement, the Policy Period's termination date was extended from July 31, 2007 to July 31, 2008.

9. The Policy states in Section I, "CONSIDERATION CLAUSE":

> In exchange for the payment of premium and subject to the Declarations, Insuring Agreements, Exclusions, General Conditions, Definitions and terms of this Policy, we will pay for loss which you sustain resulting directly from acts committed or events occurring at any time and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in General Condition L., EXTENDED PERIOD TO DISCOVER LOSS.

10. Attached to the Policy is an endorsement entitled "EMPLOYEE THEFT COVERAGE – TRADE SECRETS FOR TEMPORARY HELP AGENCIES" (the "Endorsement").

11. The Endorsement states that it "modifies the insurance provided under the following: **CrimeSHEILD Policy for Mercantile Entities.**"

12. The Endorsement further states that it "adds an additional Insuring Agreement to the Policy."

13. Section B., paragraph 1 of the Endorsement states:

> 1. We will pay for "loss" of "Trade Secrets" by "theft" which results in your "loss" and which "loss" is the direct result of the "theft" of and the subsequent personal use of or the sale of your "Trade Secrets."

14. Section B, Paragraph 6, subsection b. of the Endorsement defines "Loss" as follows:

> a. "Loss" means the actual economic loss (net revenues derived from specific customer accounts minus expenses) realized by you for any customer accounts lost directly due to "theft" by an "employee."
>
> "Loss" also means the actual economic expense associated with having to replace a "valuable employee" who is critical to your operation for attracting and retaining your existing customer base and/or running your operation and which "loss" is a direct result of the "theft" of your employee/applicant list by an "employee."

15. Section B, Paragraph 6 of the Endorsement defines "Theft" as follows:

> b. "Theft" means the act of stealing by an "employee" of your customer or employee/applicant list and the subsequent distribution or sale of such list to third parties or the retention of such list and use by such "Employee" for personal pecuniary gain.

16. Section B, Paragraph 6 of the Endorsement defines "Trade Secrets" as the insured's "proprietary customer list or [the insured's] proprietary 'employee' list."

17. Section B, Paragraph 2 of the Endorsement states that "[t]he most that [Hartford] will pay for 'loss' in any one 'occurrence' is the applicable **Limit of Insurance** shown in the **SCHEDULE.**"

18. Section A of the Endorsement, entitled "**SCHEDULE,**" provides that the "**Limit of Insurance**" with respect to any one "occurrence" is $3,000,000. The Endorsement's "**Limit of Insurance**" is in excess of a $50,000 Deductible Amount.

19. Section B, Paragraph 3 of the Endorsement states that Hartford "will not pay for 'loss' in any one 'occurrence' unless the amount of 'loss' exceeds the **Deductible Amount** shown in the **SCHEDULE**. [Hartford] will then pay the amount [of] [*sic*] 'loss' in excess of the **Deductible Amount**, up to the **Limit of Insurance**."

20. Section B, Paragraph 4 of the Endorsement states that "the **Limit of Insurance** is part of and is not in addition to the **Limit of Insurance** shown for Employee Theft Insuring Agreement 1. on the Declarations."

21. Section B, Paragraph 5 of the Endorsement sets forth the insured's notification requirements under the Endorsement, and states that the insured must:

> a. Give [Hartford] notice as soon as possible of any "loss" of the type insured under this Insuring Agreement even though it falls within the Deductible Amount.
>
> b. Upon [Hartford's] request, give [Hartford] a statement describing the "loss".

22. Section B, Paragraph 7 of the Endorsement specifically addresses how a loss involving theft of an employee of the customer list is valued under the Endorsement, and states in relevant part:

> 7. The **VALUATION** section of the **GENERAL CONDITIONS** is deleted in its entirety and replaced by the following:
>
> 1. Subject to Provision B.2. above, [Hartford] will pay for:
>
> a. "Loss" involving "theft" by an "employee" of your customer list which "loss" shall be determined by the economic loss realized on a detailed customer level for the first six (6) months following the date of "theft" of the customer list and comparing said economic loss against economic gain, if any, on a detailed customer level for the comparable six (6) month period from the prior calendar year. The period for measuring the amount of such "loss["] [sic] shall be limited exclusively to this time period. To the extent that economic loss for the six (6) month period following the date of the "theft" of the customer list is less than the economic gain, if

> any, for the comparable six (6) months of the prior calendar year, measured on a specific customer basis, the difference in these figures shall constitute your "loss" under this insurance.
>
> [Hartford] shall have no liability under this insurance if the economic loss for the six (6) month period following the date of the "theft" of the customer list exceeds the economic gain for the comparable six (6) month period of the prior calendar year as measured on a specific customer basis.

**FACTS**

23. Karen Moseman, Jason Eisenberg and Tanya Samuel are former employees of RPI (the "Former Employees").

24. During their employment with RPI, each of the Former Employees executed a Non-Disclosure of Proprietary Information Agreement (the "Non-Disclosure Agreement") in favor of RPI and its related entities.

25. Pursuant to the Non-Disclosure Agreement, the Former Employees agreed, inter alia, not to disclose or divulge "to any person, firm, corporation, or other entity, any information received by [the Former Employees] during the course of [their] employment with regard to any personnel matters, business accounts and records, corporate documentation or structure, business strategy, subscribers, policy holders or any other information relating to the affairs of [RPI] in any manner whatsoever, and all such information will be kept confidential by [the Former Employees] and will not be revealed to anyone without the prior written permission of a duly authorized officer of [RPI]."

26. Pursuant to the Non-Disclosure Agreement, the Former Employees also agreed not to disclose or divulge "to any person, firm or corporation, any information concerning the customers, prospects, business accounts, pricing, marketing information or business of [RPI],

where such information is not available or released to the general public. Such information is understood and agreed to by me to be Proprietary Information...."

27. On or about September 2, 2004, the Former Employees resigned from their employment with RPI by submitting their respective letters of resignation.

28. In Ms. Moseman and Mr. Eisenberg's letters of resignation, they each stated that they were not in possession of any materials that belong to RPI.

29. In Ms. Samuel's letter of resignation, she stated that she left instructions on her desk for her replacement, as she did not want RPI to suffer in any way from her departure from RPI.

30. On or about September 7, 2004, RPI sent letters to the Former Employees and their new employer advising them of the Former Employees' continuing duties of confidentiality, and that they were prohibited from using information they obtained during their employment with RPI.

31. Subsequent to the Former Employees' resignations, RPI discovered that on or about September 1, 2004 they had stolen confidential client information and trade secrets while employed by RPI in the form of a listing or listings of RPI's customers with respect to its Medical Placement Business (the "Confidential Information").

32. Subsequent to the Former Employees' resignations, RPI further discovered that they had distributed and/or sold the Confidential Information to third parties, and/or retained and used the Confidential Information for their personal pecuniary gain by soliciting RPI's Medical Placement Business customers.

33. The Former Employees' stealing and subsequent distribution and/or sale of the Confidential Information to third parties, and/or their retention and use of the Confidential

Information that they stole from RPI for their personal pecuniary gain, constitutes a "Theft" under the Policy.

34. In or about April 2007, RPI discovered that the Former Employees' Theft of RPI's Confidential Information resulted in a "loss" under Section B, Paragraph 7 of the Endorsement.

35. Immediately thereafter, RPI provided an initial notice of loss to Hartford.

36. In a letter dated May 8, 2007, Hartford acknowledged that it had received RPI's notice of loss, and requested additional information from RPI regarding its loss.

37. Hartford enclosed a proof of loss form (the "Proof of Loss") with its May 8, 2007 letter.

38. Thereafter, RPI completed and signed the Proof of Loss, and mailed it to Hartford.

39. Attached to the Proof of Loss is a document entitled "Period Compensation," which compares RPI's net profit with respect to each of its Medical Placement Business customers for the six month period immediately succeeding the theft of the Confidential Information, which is from September 1, 2004 to February 28, 2005 (the "Policy Loss Period") to RPI's net profit with respect to each of its Medical Placement Business Customers for the comparable six month period from the previous calendar year, September 1, 2003 to February 28, 2004 (the "Policy Lookback Period").

40. The Period Comparison document demonstrated that RPI's net profit with respect to its Medical Placement Business customers for the Policy Loss Period was $148,565.

41.     The Period Comparison document further demonstrated that RPI's net profit with respect to its Medical Placement Business customers for the Policy Lookback Period was $544,114.

42.     The Proof of Loss and Period Comparison document showed that the loss in net profit for the Policy Loss Period (the difference between RPI's net profit with respect to its Medical Placement Business customers for the Policy Lookback Period and RPI's net profit with respect to its Medical Placement Business customers for the Policy Loss Period) was $394,549.

43.     The Former Employees' theft of the Confidential Information therefore resulted in RPI sustaining an economic loss under Section B, Paragraph 7 of the Endorsement to the Policy in an amount not less than $394,549.

44.     RPI has demanded that Hartford pay for the loss that it sustained and that resulted directly from the theft of RPI's Confidential Information.

45.     RPI has satisfied all conditions precedents to coverage, fully cooperated with Hartford in the investigation of its claim for coverage, and has provided Hartford with documentation relating to its claim and with respect to the loss RPI sustained resulting from the theft of RPI's Confidential Information.

46.     In a letter dated October 22, 2007, from Ms. Glovach on behalf of Hartford, to Allen Gutterman of RPI, Hartford denied RPI's claim for coverage with respect to the loss it sustained resulting from the theft of RPI's Confidential Information.

47.     From RPI's initial notice to Hartford through the present date, at the request from Hartford and in reliance on its representation that it would investigate RPI's claim further, RPI has provided Hartford with numerous letters, affidavits, billing records, payroll records, financial

records, court documents and other information with respect to the loss RPI sustained resulting from the theft of RPI's Confidential Information.

48. RPI has further provided Hartford with information and documentation regarding a New York State Supreme Court action brought by RPI against the Former Employees and the agencies which the Former Employees went to work for after the Former Employees resigned from their employment with RPI, entitled *R.P.I. Services, Inc. d/b/a Response Medical Staffing v. Jason Eisenberg, Karen Mosemann, Tanya Samuel, Staffing Remedies, LLC, Staffing Remedies, Inc. and The Tuttle Agency, LLC*, Index No. 603216/2004 (the "*RPI v. Eisenberg* action").

49. RPI has, however, never withdrawn its denial of coverage and continues to refuse to provide coverage with respect to the loss RPI has claimed and proven it sustained in connection with the theft of its Confidential Information.

**COUNT ONE**
**(Declaratory Judgment)**

50. RPI repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51. An actual, justiciable controversy exists between the parties as to RPI's right to coverage under the Endorsement to the Policy for the loss RPI sustained resulting from the theft of RPI's Confidential Information because Hartford has denied RPI's claim for coverage with respect to such loss, has never withdrawn that denial, and continues to refuse to pay RPI for its claimed and proven loss.

52. Declaratory relief is necessary and/or appropriate to resolve this dispute and controversy.

53. Based upon the language of the Policy, facts, and correspondence and other documents referenced above and otherwise relevant to this action, RPI is entitled to a judgment

declaring that: 1) the Former Employees misappropriation of RPI's Confidential Information constitutes a "theft" under the Endorsement to the Policy, 2) Hartford is obligated under the Policy to pay RPI for the $394,549 loss it sustained because of such "theft," plus interest; 3) Hartford has waived and/or would otherwise be estopped from asserting any defenses to coverage; and 4) RPI is entitled to all costs, expenses and disbursements, including attorneys' fees, that it incurred in connection with this action and in the *RPI v. Eisenberg* Action.

**COUNT TWO**
**(Breach of Contract)**

54. RPI repeats and realleges the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

55. The Endorsement to the Policy constitutes a valid agreement between RPI and Hartford.

56. RPI has fully complied with all conditions precedent to invoking coverage under the Policy and the Endorsement.

57. At all times relevant to this action, RPI has fully cooperated with Hartford with respect to its investigation of RPI's claim for coverage regarding the theft of RPI's Confidential Information, and has provided Hartford with letters, affidavits, billing records, payroll records, financial records, court documents, and other information substantiating RPI's claimed and proven loss.

58. Hartford has breached and continues to breach the Policy by failing to properly investigate RPI's claim for coverage with respect to the theft of RPI's Confidential Information, denying RPI's claim for coverage with respect to the $394,549 loss it sustained, refusing to withdraw its denial of coverage and continuing to refuse to provide RPI coverage with respect its claimed and proven loss.

59.     Hartford's improper denial of RPI's claim for coverage has forced RPI to incur substantial fees, costs and expenses in connection with the *RPI v. Eisenberg* action.

60.     The attorneys' fees, costs and expenses incurred by RPI in the *RPI v. Eisenberg* action constitute consequential damages that were reasonably foreseeable by the parties both at the time Hartford issued the Policy to RPI and when it denied coverage for RPI's claim for coverage arising from the theft of RPI's Confidential Information.

61.     Hartford's improper denial of RPI's claim for coverage has forced RPI to retain legal counsel and commence this action in order to recover the amount of the claim due under the Policy.

62.     The attorneys' fees, costs and expenses incurred by RPI in connection with its efforts to pursue coverage under the Policy and in commencing this action constitute consequential damages that were reasonably foreseeable by the parties at the time Hartford issued the Policy to RPI and when it denied coverage for RPI's claim for coverage arising from the theft of RPI's Confidential Information.

63.     RPI has suffered, and will continue to suffer, damages as a result of Hartford's breach of the Policy.

64.     RPI is entitled to damages resulting from Hartford's breach of the Policy, including benefits under the Policy, plus interest, as well as consequential damages, including all costs, expenses and disbursements, including attorneys' fees, incurred by RPI in retaining legal counsel to secure coverage and commencing this action, and in prosecuting the *RPI v. Eisenberg* action.

        WHEREFORE, RPI respectfully requests that this Court enter a judgment against Hartford as follows:

1. With respect to RPI's First Cause of Action for a Declaratory Judgment:

   a. For a declaration that the Former Employees' misappropriation of RPI's confidential client information and trade secrets constitutes a "theft" under the Endorsement to the Policy, and that Hartford is obligated to pay to RPI the amount of the loss it sustained because of such "theft," an amount not less than $394,549, plus interest;

   b. For a declaration that Hartford has waived and/or is estopped from asserting any defenses to coverage and RPI is entitled to all costs, expenses, and disbursements, including attorneys' fees, it has incurred in this action and in the *RPI v. Eisenberg* action, in an amount to be determined and proven at trial.

   c. For such other, further, different, specific or general relief that this Court deems just and proper.

2. With respect to RPI's Second Cause of Action for Breach of Contract:

   a. For a sum equal to the benefits Hartford owes RPI under the Endorsement to the Policy, an amount not less than $394,549, plus interest;

   b. For all consequential damages resulting from Hartford's breach of contract, including all costs, expenses, disbursements, and attorneys' fees incurred by RPI in this action and in the *RPI v. Eisenberg* action, in an amount to be determined and proven at trial.

   c. For such other, further, different, specific or general relief that this Court deems just and proper.

Dated: Tarrytown, New York
July 7, 2010

By: [signature]

Mark Giacopelli, Esq. (MG0514)
KISSEL HIRSCH & WILMER LLP
580 White Plains Road, 5th Floor
Tarrytown, New York 10591
Tel.: (914) 750-5933
Fax: (914) 750-5922
Attorneys for Plaintiff,
Response Personnel, Inc.

# Exhibit A

# CrimeSHIELD Policy for Mercantile Entities

| Co Code | | Co Code | |
|---|---|---|---|
| 1 | Hartford Fire Insurance Company<br>Hartford, CT 06115 | F | Hartford Insurance Company of Illinois<br>Naperville, IL 60566 |
| 3 | Hartford Casualty Insurance Company<br>Hartford, CT 06115 | G | Hartford Insurance Company of the Midwest<br>Indianapolis, IN 46204 |
| | | J | Hartford Insurance Company of the Southeast<br>Maitland, FL 32751 |

The Company is shown above by Co. Code [1]

**POLICY NUMBER** 10 FA 0235439-06

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

**DECLARATIONS**

**ITEM**

1. **Named Insured:** RESPONSE PERSONNEL, INC.

2. **Mailing Address:** 23 EAST 39TH STREET
NEW YORK, NY 10016

3. **Policy Period:** from 7/31/06 until cancelled
(12:01 A.M. Standard Time at Your Mailing Address)

4. **Coverages, Limits of Insurance and Deductibles:**

Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| **Insuring Agreements Forming Part of This Policy** | **Limit of Insurance** | **Deductible Amount** |
|---|---|---|
| 1. Employee Theft | $ 3,000,000 | $ 50,000 |
| 2. Depositors Forgery or Alteration | $ 3,000,000 | $ 50,000 |
| 3. Theft, Disappearance and Destruction - *Money, Securities and Other Property* | $ N/A | $ N/A |
| 4. Robbery and Safe Burglary - *Money and Securities* | $ N/A | $ N/A |
| 5. Computer and Funds Transfer Fraud | $ N/A | $ N/A |

©1998, The Hartford

Throughout this Policy the words "you" and "your" refer to the named Insured in the Declarations. The words "we", "us", and "our" refer to the Company providing this insurance. Other words and phrases that appear in quotation marks have a special meaning. Refer to Section V., Exclusions; Section VI., General Conditions; and Section VII., Definitions, to determine where this Policy restricts coverage.

## I. CONSIDERATION CLAUSE

In exchange for the payment of premium and subject to the Declarations, Insuring Agreements, Exclusions, General Conditions, Definitions and terms of this Policy, we will pay for loss which you sustain resulting directly from acts committed or events occurring at any time and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in General Condition L., EXTENDED PERIOD TO DISCOVER LOSS.

## II. INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements if either an amount is stated in the Insuring Agreement or for which there is a Limit of Liability shown in the Declarations.

### A. INSURING AGREEMENT 1. - EMPLOYEE THEFT

We will pay for loss of or damage to "money", "securities" and "other property" which results directly from "theft" by an "employee", whether or not identifiable, while acting alone or in collusion with other persons.

### B. INSURING AGREEMENT 2. - DEPOSITORS FORGERY OR ALTERATION

1. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are
   a. made or drawn upon you; or
   b. made or drawn upon one acting as your agent and drawn on your account

   or that are purported to have been so made or drawn.
2. We will treat mechanically reproduced signatures the same as handwritten signatures.
3. If you are sued for refusing to pay any instrument in B.1. above, on the basis that it has been forged or altered and you have our written consent to defend against that suit, we will pay for any reasonable legal expenses that you incur and pay in such defense. The amount that we will pay is in addition to the Limit of Liability applicable to this Insuring Agreement. If a Deductible Amount applies to this Insuring Agreement, we will also apply it to the amount of legal expenses incurred in this Insuring Agreement.
4. You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss and describing both sides of said instrument..
5. This Insuring Agreement covers loss you sustain anywhere in the world; the Territory General Condition does not apply.

### C. INSURING AGREEMENT 3. - THEFT, DISAPPEARANCE AND DESTRUCTION - MONEY, SECURITIES AND OTHER PROPERTY

1. INSIDE THE PREMISES
   a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises" resulting directly from "theft", disappearance or destruction.
   b. We will pay for loss of or damage to "other property"
      (1) inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or
      (2) inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".
   c. We will pay for loss from damage to the "premises" or its exterior resulting from an actual or attempted
      (1) "theft" of "money" or "securities"; or
      (2) "robbery" or "safe burglary" of "other property"

© 1998, The Hartford

if you are the owner of the "premises" or are liable for damage to it.

d. We will pay for loss of or damage to a locked safe, vault, cash register, or cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" or unlawful entry into those containers.

2. **OUTSIDE THE PREMISES**

We will pay for

a. loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction; or

b. loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

## D. INSURING AGREEMENT 4. - ROBBERY AND SAFE BURGLARY - MONEY AND SECURITIES

1. **INSIDE THE PREMISES**

We will pay for loss of or damage to "money" and "securities"

a. resulting directly from an actual or attempted "robbery" of a "custodian" inside the "premises"; or

b. resulting directly from an actual or an attempted "safe burglary" occurring inside the "premises" or inside a "banking premises".

2. **OUTSIDE THE PREMISES**

We will pay for loss of or damage to "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

## E. INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD

We will pay for loss of and loss from damage to "money", "securities" and "other property" following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises"

1. to a person (other than a "messenger") outside those "premises"; or
2. to a place outside those "premises".

And, we will pay for loss of "money" or "securities" through "funds transfer fraud" resulting directly from "fraudulent transfer instructions" communicated to a "financial institution" and instructing such institution to pay, deliver, or transfer "money" or "securities" from your "transfer account".

## F. INSURING AGREEMENT 6. - MONEY ORDERS AND COUNTERFEIT CURRENCY

1. We will pay for loss resulting directly from your having in good faith, in exchange for merchandise, "money" or services accepted
   a. money orders issued by any post office, express company or bank in the United States of America or Canada that are not paid upon presentation; and
   b. "counterfeit" United States of America or Canadian Paper currency

   that is acquired during the regular course of business. The Limit of Insurance under this insuring agreement is $50,000. and there is no deductible applying to loss covered under this agreement.
2. You must notify the police if you have reason to believe that you have accepted a "counterfeit" money order or "counterfeit" paper currency.

© 1998, The Hartford

## III. LIMIT OF INSURANCE

The most that we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

## IV. DEDUCTIBLE

We will not pay for loss in any one "occurrence" unless the amount of the loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event that more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount will be applied.

You must give us notice as soon as possible of any loss of the type insured under the Policy if, in your best estimation, such loss will, or will appear to exceed 25% of the current Deductible Amount for the Insuring Agreement under which the loss has occurred.

## V. EXCLUSIONS *(Applying To All Insuring Agreements Unless Otherwise Specified)*

**This Policy Does Not Apply To And We Will Not Pay For:**

A. **Accounting or Arithmetical Errors or Omissions**
Loss resulting from accounting or arithmetical errors or omissions.

B. **Acts Committed By You**
Loss resulting from "theft" or any other dishonest or criminal acts committed by you whether acting alone or in collusion with others.

C. **Acts of Employees, Managers, Directors, Trustees or Representatives**
Loss resulting from "theft" or any other dishonest or criminal act committed by any of your "employees", managers, directors, trustees or representatives whether acting alone or in collusion with other persons or while performing services for you or otherwise except when covered under Insuring Agreement 1.

D. **Employee Cancelled Under Prior Insurance**
Loss cause by any "employee" of yours or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last cancellation.

E. **Exchanges or Purchases**
Loss resulting from the giving or surrendering of property in any exchange or purchase.

F. **Fire**
Loss from damage to the premises resulting from fire, however caused, **except** for loss of or damage to "money" or "securities" and loss from damage to a safe or vault under Insuring Agreement 3. and 4.

G. **Governmental Action**
Loss resulting from seizure or destruction of property by order of governmental authority.

H. **Indirect Loss**
Loss that is an indirect result of any act or "occurrence" covered by this Policy including but not limited to loss resulting from
1. your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".
2. payment or damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this policy.
3. payment of costs, fees or other expenses you incur in establishing either the existence of or the amount of loss under this policy.

I. **Inventory Shortages**
Loss, or that part of any loss, the proof of which is as to its existence or amount is dependent upon
1. an inventory computation; or
2. a profit and loss computation.

However, where you establish wholly apart from such inventory computations that you have sustained a loss covered under this Policy, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

© 1998, The Hartford

J. **Legal Expenses**
Expenses related to any legal action except when covered under Insuring Agreement 2.

K. **Money Operated Devices**
Loss of property contained in any money operated device unless the amount of any "money" deposited in it is recorded by a continuous recording instrument in the device.

L. **Motor Vehicles or Equipment And Accessories**
Loss of or damage to motor vehicles, trailers, or semi-trailers or equipment or accessories attached to them.

M. **Nuclear**
Loss resulting from nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident.

N. **Risks Inherent in Insurance Operations**
Loss resulting directly or indirectly from contractual or extra contractual liability sustained by you in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship.

O **Trading Losses**
Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

P. **Transfer or Surrender of Property**
Loss of or damage to property of any kind after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises"

1. on the basis of unauthorized instructions; or
2. as a result of a threat to do bodily harm to any person; or
3. as a result of a threat to do damage to any property.

But this Exclusion does not apply under Insuring Agreement 3. or 4. to loss of "money", "securities" and "other property" while outside the "premises" or "banking premises" in the care and custody of a "messenger" if you:

1. had no knowledge of any threat at the time that the conveyance began; or
2. had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

Q. **Vandalism**
Loss from damages to the "premises" or to the exterior of any safe, vault, cash box, cash drawer or, cash register by vandalism or mischief.

R. **Voluntary Parting of Title To or Possession of Property**
Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

S. **War and Similar Actions**
Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion, or revolution, or any related act or incident.

T. **Warehouse Receipts Losses**
Loss resulting from fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

## VI. GENERAL CONDITIONS

### A. ARMORED MOTOR VEHICLE COMPANIES

Under Insuring Agreements 3. and 4. we will pay only for the amount of loss you cannot recover

1. under your contract with the armored motor vehicle company; and
2. from any insurance or indemnity carried, by or for the benefit of customers of the armored motor vehicle company or from the armored motor vehicle company.

### B. CALCULATION OF PREMIUM

The premium charged for this Policy was computed based on rates in effect at the time the Policy was issued. On each renewal, continuation, or anniversary of the effective date of this Policy, we will compute the premium in accordance with our rates and rules then in effect.

© 1998, The Hartford

C. CANCELLATION OR NONRENEWAL OF POLICY

1. CANCELLATION

a. The first named Insured shown in the Declarations may cancel this Policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the first named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(2) 90 days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the first named Insured's last mailing address known to us.

d. Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

e. If this policy is cancelled, we will send the first named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

2. NONRENEWAL

a. We may elect not to renew this Policy at each annual anniversary date.

b. If we decide not to renew this policy, we will mail or deliver written notice to the first named Insured shown in the Declarations, at the address shown in this Policy, at least 90 days before the annual anniversary date.

c. If notice is mailed, proof of mailing will be sufficient proof of notice.

D. CANCELLATION AS TO ANY EMPLOYEE

Insuring Agreement 1. is cancelled as to any "employee"

1. immediately upon discovery by you or any of your partners, members, managers, officers, directors or trustees not in collusion with the "employee" of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

2. on the date specified in a notice mailed to you. The date will be at least 30 days after the date of the mailing. And, the mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

E. CHANGES

This Policy contains all of the agreements between you and us concerning the insurance afforded. The first named Insured shown in the Declarations is authorized to make changes in the terms of this Policy with our consent. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

F. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is void in any case of fraud by you as it relates to this Policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning

1. this Policy;
2. the property covered under this Policy;
3. your interest in the property covered under this Policy; or
4. a claim under this Policy.

G. CONSOLIDATION OR MERGER

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become "employees" or you acquire the use and control of any additional "premises"

1. you must give us written notice and obtain our written consent to extend this insurance to such additional "employees" or "premises". We may condition our consent upon payment of an

© 1998, The Hartford

additional premium; but there shall only be a premium charge if such merger or acquisition results in a 15%, or greater, increase in the number of "employees", assets or revenues acquired through the merger or acquisition.

2. For the first 60 days after the effective date of such consolidation, merger, acquisition of assets or liabilities, any insurance afforded for "employees" or "premises" also applies to these additional "employees" or "premises" for acts committed within this 60 day period.

H. DISCOVERY

1. We will pay for loss which you sustain through acts or events committed or occurring at any time and which are discovered by you during the Policy Period or during the period provided in General Condition L., EXTENDED PERIOD TO DISCOVER LOSS.
2. Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this Policy has been, or may be incurred even though the exact amount or the details of the loss may not then be known.
3. Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts, which if true, would constitute a covered loss under this policy.

I. DUTIES IN THE EVENT OF LOSS

After you discover a loss or a situation which may result in a loss of or damage to "money", "securities" or "other property", you must

1 notify us as soon as possible but no later than 60 days after discovery of loss.
2 submit to examination under oath at our request and give us a signed statement of your answers.
3. give us a detailed, sworn proof of loss within 120 days.
4. cooperate with us in the investigation and settlement of any claim.
5. notify the police if you have reason to believe that your loss involves a violation of law.

J. EMPLOYEE BENEFIT PLANS

1. If any one or more "employee benefit Plans" are insured jointly with any other entity under this Policy, you or the plan administrator must select a Limit of Insurance for Insuring Agreement 1. that is sufficient to provide a Limit of Insurance for each Plan which is at least equal to that required if each Plan were separately insured.
2. If the first named Insured is an entity other than a Plan, any payments we make to the Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.
3. If two or more Plans are insured under this Policy, any payment which we make for loss sustained by two or more Plans, or of commingled "funds" or "other property" of two or more Plans, which arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total of those limits.
4. This Policy insures those Plans which are named as additional Insureds in the Declarations or on any attached Schedule for loss through fraud or dishonesty as defined in Section 2580.412-9 of the Employee Retirement Income Security Act (ERISA) as amended. For any Plans not specifically named as Insureds, this Policy is deemed to be in compliance with, and satisfy the bonding requirements of Section 2580.312-11 of the act. This insurance provides a Limit of Insurance which is equal to 10% of the amount of the funds handled or $500,000., whichever is less, for each Plan bonded and the minimum Limit of Insurance for any Plan shall be $1,000. The Limit of Insurance available for any Plan loss will be determined by the amount of funds handled on the date when any covered loss occurs subject to the foregoing limitations.
5. The Deductible provision which applies to the Employee Theft Insuring Agreement shall not apply to loss which is sustained by any Plan subject to ERISA and which Plan is covered under this insurance.

K. EXAMINATION OF YOUR BOOKS AND RECORDS

1. We may examine and audit your books and records as they relate to this Policy at any time during the Policy Period and up to three years afterward.
2. We may also examine and audit the books and records of any organization which you newly acquire and that is deemed to be a named Insured under this Policy.

© 1998, The Hartford

L. **EXTENDED PERIOD TO DISCOVER LOSS**

We will pay for loss which you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you

1. no later than 60 days from the date of the termination, cancellation or non-renewal; and
2. as respects any "employee benefit Plan(s)", no later than 1 year from the date of that termination, cancellation or non-renewal.

However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you to replace, in whole or in part, the insurance afforded by this Policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

M. **FACSIMILE SIGNATURES**

We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

N. **INSPECTION AND SURVEYS**

1. We have the right but are not obligated to
   a. make inspections and surveys at any time;
   b. give you reports on the conditions we find; and
   c. recommend changes.
2. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or the safety of workers or the public. And, we do not warrant that conditions
   a. are safe or healthful; or
   b. comply with laws, regulations, codes or standards.
3. This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

O. **JOINT INSURED**

1. If more than one Insured is named in the Declarations, the first named Insured will act for itself and for every other Insured for all purposes of this Policy. If the first named Insured ceases to be covered, then the next named Insured will become the first named Insured.
2. If any Insured, partner, member or officer of an Insured has knowledge of any information relevant to this Policy, that knowledge is considered to be knowledge of every Insured.
3. An "employee" of any Insured is considered to be an "employee" of every Insured.
4. If this Policy or any of its Insuring Agreements is cancelled, terminated or non-renewed as to any Insured, loss sustained by that Insured is covered only if discovered by you during the period of time provided in General Condition L., EXTENDED PERIOD TO DISCOVER LOSS. And, this extended period to discover loss also terminates in accordance with paragraph 2 of that condition.
5. We will not pay a greater amount for loss sustained by more than one Insured than we would pay if all of the loss had been sustained by one Insured.

P. **LEGAL ACTION AGAINST US**

You may not bring any legal action against us involving loss

1. unless you have complied with all the terms of this Policy; and
2. until 90 days after you have filed proof of loss with us; and
3. unless such action is brought within 2 years from the date that you discover such loss.

Q. **LIBERALIZATION**

If we adopt any revision that would broaden the coverage within the Policy without additional premium within 45 days prior to or during the Policy Period, the broadened coverage will immediately apply to this Policy.

R. **LOSS COVERED UNDER MORE THAN ONE INSURING AGREEMENT OF THIS POLICY**

If two or more Insuring Agreements of this Policy apply to the same loss, we will pay the lesser of

1. the actual amount of loss; or
2. the sum of the Limits of Insurance applicable to those Insuring Agreements.

© 1998, The Hartford

S. **NON ACCUMULATION OF LIMIT OF INSURANCE**

Regardless of the number of years this Policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or Policy Period to Policy Period.

T. **OTHER INSURANCE**

1. This policy does not apply to loss recoverable or recovered under other insurance or indemnity. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity.
2. However, this Policy will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the Declarations.

U. **OWNERSHIP OF PROPERTY; INTERESTS COVERED**

1. The property covered under this Policy is limited to property
   a. that you own, lease or client property which you hold on your "premises" or which is in the custody of one acting as your "messenger" and while such property is in transit; or
   b. for which you are legally liable excepting loss of client property occurring on such client's premises.
2. However, this Policy is for your benefit alone and no other person or organization has any rights or benefits. However, any claim for a loss of client property occurring on your "premises" or while in transit in the custody of a "messenger" may only be made by you in your proof of loss.

V. **PREMIUMS**

The first named Insured is responsible for the payment of all premiums and will be the payee for all return premiums we pay.

W. **RECORDS**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

X. **RECOVERIES**

1. Any recoveries, less the cost of obtaining them, made after the settlement of loss covered by this Policy will be distributed
   a. to you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;
   b. then to us, until we are reimbursed for the settlement made; and
   c. then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.
2. Recoveries do not include any recovery
   a. from insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or
   b. of original "securities" after duplicates of them have been issued.

Y. **SPECIAL LIMIT OF INSURANCE FOR SPECIFIED PROPERTY (Insuring Agreement 3.)**

We will pay no more than $5,000. for any one "occurrence" of loss of or damage to

1. precious metals, precious or semi-precious stones, pearls, furs or completely or partially completed articles made of or containing such materials that constitute the principal value of such articles; or
2. manuscripts, drawings or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

Z. **TERRITORY**

This Policy covers acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico or Canada. However, we will pay for loss under Insuring Agreement 1. which is caused by an "employee" while temporarily outside of the territories named in this General Condition for a period of not more than 90 consecutive days.

© 1998, The Hartford

AA. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

1. Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named Insured.
2. If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

BB. TRANSFER OF YOUR RIGHTS OF RECOVERY AGAINST OTHERS TO US

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

CC. VALUATION

1. Subject to the applicable Limit of Insurance, we will pay for
   a. loss of "money" but only up to and including its face value. We may, at our option, pay for a loss of "money" issued by other than the United States of America in either the face value in the "money" issued in that country, or, in the United States of America dollar equivalent determined by the rate of exchange on the day that the loss occurred.
   b. loss of "securities' but only up to and including their value at the close of business on the day that the loss was discovered. But, we may, at our option, 1) pay the value of such "securities", 2) replace them in kind in which event you must assign to us all your rights, title and interest in and to those "securities" or 3) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding
      (1) the value of the "securities" at the close of the business on the day the loss was discovered; or
      (2) the Limit of Insurance.
   c. loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay for more than the lesser of
      (1) the Limit of Insurance applicable to the lost or damaged property; or
      (2) the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or
      (3) the amount that you actually spend that is necessary to repair or replace the lost or damaged property.
2. We will not pay on a replacement cost basis for any loss or damage
   a. until the lost or damaged property is actually repaired or replaced; and
   b. unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

   If the lost or damaged property is not repaired or replaced, we will pay based on actual cash value.
3. We may, at our option, pay for loss of or damage to property other than "money" in the "money" of the country in which the loss occurred; or in the United States of America dollar equivalent of the "money" of the country where the loss occurred determined by the rate of exchange on the day the loss was discovered. Any property that we pay for or replace becomes our property.
4. Loss of or loss from damage to any books or records of account or other records, tapes, disks, or electronic media used by you in the business but only if
   a. such books, records, tapes or disks are actually reproduced and then only for not more than the blank books, pages, tapes and disks or other materials plus the cost of labor for the actual transcription or copying of data which you shall furnish to reproduce such books, records, tapes or disks.

VII DEFINITIONS

A. *"Banking premises"* means the interior portion of that part of any building occupied by a banking institution or similar safe depository.

B. *"Counterfeit"* means an imitation of an actual valid original which is intended to deceive and to be taken as an original.

© 1998, The Hartford

C. *"Custodian"* means you, or any of your partners, or members or any "employee" while having the care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

D. *"Employee"* means

1. any natural person
   a. while in your service or for 60 days after termination of service; and
   b. who you compensate directly by salary, wages, commissions; and
   c. who you have the right to direct and control while performing services for you; including one
   d. who is performing services for you as the chairman, or a member of any committee and whether compensated or not; or
   e. who is a director or trustee while acting as a member of any of your elected or appointed committees to perform on your behalf, specific, as distinguished from general directorial acts; or
   f. who is a non-compensated officer; or
   g. who is a volunteer who is not compensated, other than one who is a fund solicitor, while performing services for you that are usual to the duties of an "employee"; or
   h. who is a former employee, director, partner, member, representative or trustee retained as a consultant while performing services for you; or
   i. who is a student intern or guest student pursuing studies or duties in any of your offices or "premises"; and
   j. who is your partner or member (of limited liability corporations), but we will not pay for loss caused by any partner or member, unless the amount of the loss exceeds the sum of
      (1) any amounts you owe that partner or member; and
      (2) the value of that partner's partnership interest, or that member's ownership interest determined by the closing of your organization's books on the date of discovery of the loss by your organization by anyone not in collusion with the person causing the loss, and
      (3) any applicable Deductible Amount; then

      we will pay the amount of loss excess of that sum, up to the Limit of Insurance applicable to Insuring Agreement 1.
2. a natural person who is a trustee, officer, "employee", administrator or manager, except an administrator or a manager who is an independent contractor, of any "employee benefit Plan(s)" insured under this Policy; and your director or trustee while that person is handling "funds" or "other property" of "employee benefit Plan(s)" insured under this Policy.
3. a natural person who is furnished temporarily to you to substitute for a permanent "employee" to meet seasonal or short term work load conditions and while that temporary person is subject to your direction and control and performing services for you. However, such persons are excluded while having care and custody of property outside the "premises"; and
   a. "employee" does NOT mean
      (1) any agent, broker, person leased to you by a labor leasing firm, factor, commission merchant, consignee, independent contractor or representative of the same general character; or
      (2) any manager, director, partner, member or trustee except while performing acts coming within the scope of the usual duties of an "employee".

E. *"Employee benefit Plan(s)"* means any welfare or pension Plan listed in the Declarations, on an attached schedule or for which automatic coverage is afforded that is subject to the Employee Retirement Income Security Act (ERISA) of 1974, as amended.

F. *"Financial Institution"* means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which you maintain a "transfer account".

G. *"Forgery"* means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any reason.

© 1998, The Hartford

H.  *"Fraudulent transfer instructions"* means
    1.  fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a "financial institution" to debit a "transfer account" and to pay, transfer or deliver "money" or "securities" from such account and which instructions purport to have been authorized by you but which have been fraudulently transmitted by another; or
    2.  fraudulent written instructions to a "financial institution" to debit a "transfer account" and to pay, transfer or deliver "money" or "securities" from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by you but which have been fraudulently issued, forged or altered by another.

I.  *"Funds transfer fraud"* means "theft" of "money" or "securities" from any of your "transfer accounts" at a "financial institution" and occurring through "fraudulent transfer instructions" communicated to such "financial institution".

J.  *"Messenger"* means you, any of your partners or members or any "employee" while having care and custody of property outside the "premises".

K.  *"Money"* means currency, coins and bank notes in current use and having a face value; and travelers checks, register checks and money orders held for sale to the general public.

L.  *"Occurrence"* means
    1.  as respects the Employee Theft Insuring Agreement, all loss caused by, or involving, one or more "employees", whether the result of a single act or a series of acts.
    2.  as respects the Forgery or Alteration Insuring Agreement, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.
    3.  as respects all other Insuring Agreements, an act or series of related acts involving one or more persons; or an act or event or a series of related acts or events not involving any person.

M.  *"Other Property"* means any tangible property other than "money" or "securities" that has intrinsic value but does not include any property excluded under this Policy. "Other property" does not include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

N.  *"Premises"* means the interior of that portion of any building which you occupy in conducting your business.

O.  *"Robbery"* means the unlawful taking of property from the care and custody of a person by one who has caused or threatened to cause that person bodily harm, or, committed an obviously unlawful act witnessed by that person.

P.  *"Safe burglary"* means the unlawful taking of property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior, or, the taking of a safe or vault from inside the "premises".

Q.  *"Securities"* means negotiable or non-negotiable instruments or contracts representing either "money" or property and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and, evidences of debt issued in connection with credit or charge cards, which cards are not issued by you; but does not include "money".

R.  *"Theft"* means the unlawful taking of "money", "securities" or "other property" to the deprivation of the Insured.

S.  *"Transfer account"* means an account maintained by you at a "financial institution" from which you or your authorized representative may cause the payment, transfer or delivery of "money" or "securities" by any means described in the "fraudulent transfer instructions" definition.

T.  *"Watchperson"* means any person who you retain specifically to have the care and custody of property inside the "premises" and who has no other duties.

© 1998, The Hartford

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE THEFT COVERAGE - TRADE SECRETS FOR TEMPORARY HELP AGENCIES

This endorsement adds an additional Insuring Agreement to the Policy.

**A. SCHEDULE**

| | Limit of Insurance | Deductible Amount |
|---|---|---|
| INSURING AGREEMENT 1.D. TRADE SECRETS FOR TEMPORARY HELP AGENCIES | $2,000,000 | 25,000 |

**B. PROVISIONS**

1. We will pay for "loss" of "Trade Secrets" by "theft" which results in your "loss" and which "loss" is the direct result of the "theft" of and the subsequent personal use of or the sale of your "Trade Secrets".
2. The most we will pay for "loss" in any one "occurrence" is the applicable **Limit of Insurance** shown in the **SCHEDULE.**
3. We will not pay for "loss" in any one "occurrence" unless the amount of "loss" exceeds the **Deductible Amount** shown in the **SCHEDULE.** We will then pay the amount "loss" in excess of the **Deductible Amount,** up to the **Limit of Insurance.**
4. This **Limit of Insurance** is a part of and not in addition to the **Limit of Insurance** shown for Employee Theft Insuring Agreement 1. on the Declarations.
5. You must:
   a. Give us notice as soon as possible of any "loss" of the type insured under this Insuring Agreement even though it falls within the Deductible Amount.
   b. Upon our request, give us a statement describing the "loss".
6. In addition to the provisions in the Policy, this Insuring Agreement is subject to the following additional Definitions
   a. "Loss" means the actual economic loss (net revenues derived from specific customer accounts minus expenses) realized by you for any customer accounts lost directly due to "theft" by an "employee".

      "Loss" also means the actual economic expense associated with having to replace a "valuable employee" who is critical to your operation for attracting and retaining your existing customer base and/or running your operation and which "loss" is a direct result of the "theft" of your employee/applicant list by an "employee".
   b. "Theft" means the act of stealing by an "employee" of your customer or employee/applicant list and the subsequent distribution or sale of such list to third parties or the retention of such list and use by such "Employee" for personal pecuniary gain.
   c. "Trade Secrets" means your proprietary customer list or your proprietary "employee" list.
   d. "Valuable Employee" means a person who has had at least three years of employment with you in an executive position or who has three years of experience and direct contact with your customers.

© 1999, The Hartford

7. The **VALUATION** section of the **GENERAL CONDITIONS** is deleted in its entirety and replaced by the following:

1. Subject to Provision B.2. above, we will pay for:

   a. "Loss" involving "theft" by an "employee" of your customer list which "loss" shall be determined by the economic loss realized on a detailed customer level for the first six (6) months following the date of "theft" of the customer list and comparing said economic loss against economic gain, if any, on a detailed customer level for the comparable six (6) month period from the prior calendar year. The period for measuring the amount of such "loss' shall be limited exclusively to this time period. To the extent that economic loss for the six (6) month period following the date of the "theft" of the customer list is less than the economic gain, if any, for the comparable six (6) months of the prior calendar year, measured on a specific customer basis, the difference in these figures shall constitute your "loss" under this insurance.

We shall have no liability under this insurance if the economic loss for the six (6) month period following the date of the "theft" of the customer list exceeds the economic gain for the comparable six (6) month period of the prior calendar year as measured on a specific customer basis.

   b. "Loss' involving "theft" by an "employee" of your customer list shall be the reasonable costs which you incur to replace a "valuable employee". You must demonstrate that the loss of one or more of your "employees" to a competitor was a direct result of the "theft" of and the conveyance of your employee/applicant list.

A "loss" incurred by you as a direct result of the "theft" of your employee/applicant list includes, and is limited to, specific educational business training paid by you for the lost "employee" and which training was expected to provide you with a future economic benefit. Such "loss" incurred by you shall be limited to training expense incurred and paid by you within the twenty-four (24) month period preceding the loss of such "employee". Said training expense shall be measured by said twenty-four (24) month or the actual period over which such expense shall be incurred, whichever is less.

Said "loss" shall also include the cost of fees paid to an executive search firm to replace the former "employee" plus the cost of any sign-on bonus, salaries and wages paid to obtain a replacement "employee" of comparable experience, ability and job position; provided however, that the aggregate of such costs, salaries or wages exceed the most current annual salary paid (reported on the former "employee's" Form W-2 or Form 1099) to the former "employee".

© 1999, The Hartford

ENDORSEMENT NO: 14

This endorsement, effective 12:01 am, 7/31/06 forms part of policy number 10 FA 0235439-06

issued to: RESPONSE PERSONNEL, INC.

by: HARTFORD FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE THEFT COVERAGE - TRADE SECRETS

## FOR TEMPORARY HELP AGENCIES

This endorsement modifies insurance provided under the following:

**CrimeSHIELD Policy for Mercantile Entities**

This endorsement adds an additional Insuring Agreement to the Policy.

**A. SCHEDULE**

| | Limit of Insurance | Deductible Amount |
|---|---|---|
| INSURING AGREEMENT 1.D.<br>TRADE SECRETS FOR TEMPORARY HELP AGENCIES | $3,000,000 | $ 50,000 |

**B. PROVISIONS**

1. We will pay for "loss" of "Trade Secrets" by "theft" which results in your "loss" and which "loss" is the direct result of the "theft" of and the subsequent personal use of or the sale of your "Trade Secrets".

2. The most we will pay for "loss" in any one "occurrence" is the applicable **Limit of Insurance** shown in the **SCHEDULE**.

3. We will not pay for "loss" in any one "occurrence" unless the amount of "loss" exceeds the **Deductible Amount** shown in the **SCHEDULE**. We will then pay the amount "loss" in excess of the **Deductible Amount**, up to the **Limit of Insurance**.

4. This **Limit of Insurance** is a part of and not in addition to the **Limit of Insurance** shown for Employee Theft Insuring Agreement 1. on the Declarations.

5. You must:

   a. Give us notice as soon as possible of any "loss" of the type insured under this Insuring Agreement even though it falls within the Deductible Amount.

   b. Upon our request, give us a statement describing the "loss".

© 2006, The Hartford

ENDORSEMENT NO: 14

6. In addition to the provisions in the Policy, this Insuring Agreement is subject to the following additional Definitions

   a. "Loss" means the actual economic loss (net revenues derived from specific customer accounts minus expenses) realized by you for any customer accounts lost directly due to "theft" by an "employee".

      "Loss" also means the actual economic expense associated with having to replace a "valuable employee" who is critical to your operation for attracting and retaining your existing customer base and/or running your operation and which "loss" is a direct result of the "theft" of your employee/applicant list by an "employee".

   b. "Theft" means the act of stealing by an "employee" of your customer or employee/applicant list and the subsequent distribution or sale of such list to third parties or the retention of such list and use by such "Employee" for personal pecuniary gain.

   c. "Trade Secrets" means your proprietary customer list or your proprietary "employee" list.

   d. "Valuable Employee" means a person who has had at least three years of employment with you in an executive position or who has three years of experience and direct contact with your customers.

7. The **VALUATION** section of the **GENERAL CONDITIONS** is deleted in its entirety and replaced by the following:

   1. Subject to Provision B.2. above, we will pay for:

      a. "Loss" involving "theft" by an "employee" of your customer list which "loss" shall be determined by the economic loss realized on a detailed customer level for the first six (6) months following the date of "theft" of the customer list and comparing said economic loss against economic gain, if any, on a detailed customer level for the comparable six (6) month period from the prior calendar year. The period for measuring the amount of such "loss' shall be limited exclusively to this time period. To the extent that economic loss for the six (6) month period following the date of the "theft" of the customer list is less than the economic gain, if any, for the comparable six (6) months of the prior calendar year, measured on a specific customer basis, the difference in these figures shall constitute your "loss" under this insurance.

         We shall have no liability under this insurance if the economic loss for the six (6) month period following the date of the "theft" of the customer list exceeds the economic gain for the comparable six (6) month period of the prior calendar year as measured on a specific customer basis.

      b. "Loss' involving "theft" by an "employee" of your customer list shall be the reasonable costs which you incur to replace a "valuable employee". You must demonstrate that the loss of one or more of your "employees" to a competitor was a direct result of the "theft" of and the conveyance of your employee/applicant list.

         A "loss" incurred by you as a direct result of the "theft" of your employee/applicant list includes, and is limited to, specific educational business training paid by you for the lost "employee" and which training was expected to provide you with a future economic benefit. Such "loss" incurred by you shall be limited to training expense incurred and paid by you within the twenty-four (24) month period preceding the loss of such "employee". Said training expense shall be measured by said twenty-four (24) month or the actual period over which such expense shall be incurred, whichever is less.

         Said "loss" shall also include the cost of fees paid to an executive search firm to replace the former "employee" plus the cost of any sign-on bonus, salaries and wages paid to obtain a replacement "employee" of comparable experience, ability and job position; provided however, that the aggregate of such costs, salaries or wages exceed the most current annual salary paid (reported on the former "employee's" Form W-2 or Form 1099) to the former "employee".

 © 2006, The Hartford

ENDORSEMENT NO: 14

All other terms and conditions remain unchanged.

David Zwiener, President

© 2006, The Hartford



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AUTOMATIC INCLUSION OF JOINT INSUREDS

This endorsement applies to the Policy and all of the Insuring Agreements forming part of this Policy.

**PROVISIONS**

A. The named Insured(s) shown in the Declarations is amended to include the following language:

and any interest hereafter 50% or more owned, controlled or operated by any one or more of those named as Insureds provided, however, that you give us written notice within 90 days thereafter and pay us an additional premium, if applicable.

© 1998, The Hartford



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# THEFT OF CLIENTS' PROPERTY OFF PREMISE - BLANKET

This endorsement adds an additional Insuring Agreement to the Policy as follows:

A. SCHEDULE

| | LIMIT OF INSURANCE | DEDUCTIBLE AMOUNT |
|---|---|---|
| INSURING AGREEMENT 1.C. - THEFT OF CLIENTS' PROPERTY OFF PREMISES | $2,000,000 | $25,000 |

B. PROVISIONS

1. We will pay for loss of or damage to "money", "securities" and "other property" that is owned or leased by a client with which you are under written contract to perform services on that client's premises and which loss results directly from "theft" by an identified "employee", whether acting alone or in collusion with others.

2. The most we will pay for loss in an "occurrence" is the Limit of Insurance shown in the **SCHEDULE** subject to the **Deductible Amount**. That Limit of Insurance is a part of, not in addition to, the Limit of Insurance, shown in the Declarations.

3. Paragraph 1.b. of the **OWNERSHIP OF PROPERTY; INTERESTS COVERED** General Condition is replaced by the following:

   b. for which you are legally liable.

4. The insurance provided by this Insuring Agreement is for your benefit alone. Any claim for loss sustained by your client and caused by "theft" by an "employee" shall be made by you. No other person or organization has any rights under this Policy.

© 1998, The Hartford



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BRIDGE ENDORSEMENT
# DISCOVERY SUPERSEDING LOSS SUSTAINED COVERAGE

This endorsement applies to the Policy and all of the Insuring Agreements forming part of this Policy.

**PROVISIONS**

If the Policy to which this endorsement is attached has replaced similar prior insurance written by a company other than us, and such other insurance provided a period of time to discover loss occurring prior to the termination or cancellation of that coverage, then, the **OTHER INSURANCE** General Condition is amended by adding the following:

3. If a loss is discovered within the period provided by prior insurance to discover losses, we will not pay for such loss unless the amount exceeds the Limit of Insurance under your prior Policy. We will then only pay you for any excess loss subject to the Insuring Agreements, Exclusions and General Conditions of this Policy.

4. Any payment that we make to you under this Insurance shall not exceed the difference between the amount of Insurance under your prior Policy and the Limit of Insurance shown in the Declarations and we will not apply our **Deductible Amount** to any excess loss payment.

© 1998, The Hartford



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND GENERAL CONDITION J. 4. - EMPLOYEE BENEFIT PLANS

This endorsement applies to the CrimeSHIELD Policy for Mercantile Entities.

**PROVISIONS**

**SECTION VI. GENERAL CONDITIONS, J. 4. EMPLOYEE BENEFIT PLANS**, is hereby deleted in its entirety and replaced with the following:

4. This Policy insures any Employee Welfare or Pension Benefit Plan which is sponsored by one or more of the Named Insureds for loss through fraud or dishonesty as defined in Section 2580.412-9 of the Employee Retirement Income Security Act (ERISA) as amended. For those plans which are specifically named as additional insureds in the Declarations or on any attached Schedule, the maximum Limit of Insurance is the amount shown on the Declarations under **Item 4., Coverages, Limits of Insurance and Deductibles, Insuring Agreements Forming Part of This Policy,** 1. Employee Theft. For any Plan not specifically named as an Insured, this Policy is deemed to be in compliance with, and satisfy the bonding requirements of Section 2580.412-11 of ERISA. For such unnamed Plans, this insurance provides a Limit of Insurance for each Plan which is the lessor of:

   (a) $500,000; or
   (b) 10% of the amount of the funds handled; or
   (c) The Limit of Insurance shown on the Declarations under **Item 4., Coverages, Limits of Insurance and Deductibles, Insuring Agreements Forming Part of This Policy,** 1. Employee Theft.

   The minimum Limit of Insurance for any Plan shall be $1,000. In no event shall coverage for any Plan, whether specifically named as an additional insured or not, be more than the Limit of Insurance shown on the Declarations under **Item 4., Coverages, Limits of Insurance and Deductibles, Insuring Agreements Forming Part of This Policy, 1.** Employee Theft.

   The Limit of Insurance available for any Plan loss will be determined to equal the amount required under ERISA at the time you discover a loss, subject to the foregoing limitations.

©2001 The Hartford

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND EXCLUSION J. Legal Expenses TO INCLUDE DEFENSE COSTS

This endorsement applies only to EMPLOYEE THEFT INSURING AGREEMENT 1.

## A. SCHEDULE

| Limit of Insurance | Deductible Amount |
|---|---|
| $100,000 | $10,000 |

## B. PROVISIONS

1. **EXCLUSION** J. **Legal Expenses** is deleted in its entirety and replaced by the following:

   **J. Legal Expenses**
   Expenses related to any legal actions; however, we will reimburse you for reasonable "defense costs" which you incur and which result from a legal action brought against you by one of your clients or customers. Said legal action must directly arise from an allegation by a client or customer that an "employee" has caused a loss to said client or customer through "employee dishonesty" while said "employee" is acting in the normal course of employment and while directly compensated by you.

2. The most we will pay is the **Limit of Insurance** shown in the **SCHEDULE**, excess of the **Deductible Amount** shown in the **SCHEDULE**. This **Limit of Insurance** is a part of and not in addition to the **Limit of Insurance** shown for Employee Theft Insuring Agreement 1. on the Declarations.

3. The **DEFINITIONS** section of the Policy is amended by adding the following:

   U. *"Defense Costs"* means court costs and external attorney fees. Such attorney fees are not inclusive of normal salaries or compensation paid to "employees'.

© 1999, The Hartford



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES

A. The following General Condition is added to the Policy:

**CALCULATION OF PREMIUM**

1. For Policies with fixed terms in excess of one year, or Policies with no stated expiration date, except as provided in paragraph B., the following applies:
   The premium shown in the Declarations was computed based on rates and rules in effect at the time the Policy was issued. On each renewal or continuation of this Policy, we will compute the premium in accordance with our rates and rules then in effect.
2. For Policies with fixed terms in excess of one year, where premium is computed and paid annually, the following applies:
   a. The premium shown in the Declarations was computed based on rates and rules in effect at the time the Policy was issued. Such rates and rules will be used to calculate the premium at each anniversary, for the entire term of the Policy, unless the specific reasons described in paragraph 2. or 3. apply.
   b. The premium will be computed based on the rates and rules in effect on the anniversary date of the Policy only when, subsequent to the inception of the current Policy Period, one or more of the following occurs:
      (1) After issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current Policy Period.
      (2) A material physical change in the property insured, occurring after issuance or last anniversary renewal date of the Policy, causes the property to become uninsurable in accordance with underwriting standards in effect at the time the Policy was issued or last renewed; or
      (3) A material change in the nature or extent of the risk, occurring after issuance or last anniversary renewal date of the Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed.
3. If, subsequent to the inception of the current Policy Period, the Limit of Insurance is increased, or Additional Insuring Agreements or Causes of Loss are insured, the rate and rules in effect at the time of the change will be applied to calculate the premium and will continue to apply to the change at subsequent anniversary dates.

B. Paragraphs a., b., c. and d. of the **CANCELLATION** General Condition are replaced by the following:
   a. The first named Insured shown in the Declarations may cancel this entire Policy by mailing or delivering to us advance written notice of cancellation.
   b.1. **CANCELLATION OF POLICIES IN EFFECT:**
      (1) **60 DAYS OR LESS**
      We may cancel this Policy by mailing or delivering to the first named Insured written notice of cancellation at least:
      (a) 30 days before the effective date of cancellation if we cancel for any reason not included in paragraph A.b.1.(b) below.
      (b) 15 days before the effective date of cancellation if we cancel for any of the following reasons:
         (i) Nonpayment of premium;
         (ii) Conviction of a crime arising out of acts increasing the hazard insured against;

© 1998, The Hartford
Includes copyrighted material of Insurance Services Office, Inc. with its permission
©copyright, Insurance Services Office, Inc., 1997

(iii) Discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a claim;

(iv) After issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current Policy Period;

(v) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the Policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed;

(vi) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

(vii) A determination by the Superintendent that continuation of the Policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(viii) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

(2) **FOR MORE THAN 60 DAYS**

If this Policy has been in effect for more than 60 days, or if this Policy is a renewal or continuation of a Policy we issued, we may cancel only for any of the reasons listed in paragraph **A.2.a.(2)** above, provided we mail the first named insured written notice at least 15 days before the effective date of cancellation.

c. We will mail or deliver our notice, including the reason for cancellation, to the first named insured at the address shown in the Policy and to the authorized agent or broker.

d. If this Policy is canceled, we will send the first named insured any premium refund due. If we cancel, the refund will be pro rata. If the first named insured cancels, the refund may be less than pro rata. However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total Policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added to the **CANCELLATION** General Condition:

g. If one of the reasons for cancellation in paragraphs A.b.1.(b) exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**D.** The **NONRENEWAL** General Condition is replaced by the following:

**NONRENEWAL**

If we decide not to renew this Policy we will send notice as provided in **NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL** General Conditions.

**E.** The following General Conditions are added:

**CONDITIONAL RENEWAL**

If we conditionally renew this Policy subject to a:

1. Change of limits;
2. Change in type of coverage;
3. Reduction of coverage;
4. Increased deductible;
5. Addition of exclusion; or

© 1998, The Hartford
Includes copyrighted material of Insurance Services Office, Inc. with its permission
©copyright, Insurance Services Office, Inc., 1997

6. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in the **NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL** General Condition.

**NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL**

1. If we decide not to renew this Policy or to conditionally renew this Policy as provided in the **NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL** General Condition above, we will mail or deliver written notice to the first named Insured shown in the Declarations at least 60 but not more than 120 days before:
   (a) The expiration date; or
   (b) The anniversary date if this is a continuous policy.
2. Notice will be mailed or delivered to the first named Insured at the address shown in the Policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.
3. Notice will include the specific reason(s) for non-renewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.
4. If we violate any of the provisions of paragraphs a b. or c. above by sending the first named Insured an incomplete or late conditional renewal notice or a late non-renewal notice:
   (a) Coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first named Insured, during this 60 day period, has replaced the coverage or elects to cancel.
   (b) On or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this Policy for another Policy Period, at the lower of the current rates or the prior period's rates, unless the first named Insured, during this additional Policy Period, has replaced the coverage or elects to cancel.
5. We will not send you notice of non-renewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the Policy has been replaced or is no longer desired.

© 1998, The Hartford
Includes copyrighted material of Insurance Services Office, Inc. with its permission
©copyright, Insurance Services Office, Inc., 1997



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# JOINT INSURED

This endorsement modifies insurance provided under the following:

INSURING AGREEMENT -

- [x] EMPLOYEE THEFT - INSURING AGREEMENT 1.
- [ ] EMPLOYEE THEFT - INSURING AGREEMENT 1.A.
- [ ] EMPLOYEE THEFT - INSURING AGREEMENT 1.B.
- [x] DEPOSITORS FORGERY OR ALTERATION - INSURING AGREEMENT 2.
- [ ] THEFT, DISAPPEARANCE AND DESTRUCTION - MONEY, SECURITIES AND OTHER PROPERTY - AGREEMENT 3.
- [ ] ROBBERY AND SAFE BURGLARY - MONEY AND SECURITIES - AGREEMENT 4.
- [ ] COMPUTER AND FUNDS TRANSFER FRAUD - INSURING AGREEMENT .5
- [ ]

The following is/are added as a named Insured:

Response Personnel, Inc. d/b/a Response Professional Alternatives, Inc.; Response Staffing Solutions, Inc. of Connecticut; Response Staffing Solutions, Inc. of New Jersey; RPI Services, Inc.

The following is/are deleted as a named Insured:

© 1998, The Hartford