```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
RESPONSE PERSONNEL, INC.,             :
                                      :          10 Civ. 5196 (DLC)
                    Plaintiff,        :
                                      :          OPINION & ORDER
          -v-                         :
                                      :
HARTFORD FIRE INSURANCE CO.,          :
                                      :
                    Defendant.        :
                                      :
------------------------------------- X
```

APPEARANCES:

For Plaintiff:
Frederick J. Wilmer
Mark Giacopelli
Kissel, Hirsch & Wilmer LLP
580 White Plains Road
Tarrytown, NY 10591

For Defendants:
Carol A. Pisano
McElroy, Deutsch, Mulvaney & Carpenter LLP
88 Pine Street, 24th Floor
New York, NY 10005

DENISE COTE, District Judge:

     Response Personnel, Inc. ("RPI") brings the above-captioned

action against Hartford Fire Insurance Co. ("Hartford") for: (1)

a declaration that certain losses RPI sustained from the

departure of critical employees are covered by an insurance

policy issued to it by Hartford; and, (2) damages for Hartford's

breach of that contract.  Hartford has moved pursuant to Rule

12(b)(6), Fed. R. Civ. P., to dismiss plaintiff's amended

complaint ("Complaint") for failure to state a claim.  Hartford

principally argues that RPI's loss was sustained and discovered before the policy period. For the following reasons, Hartford's motion to dismiss is converted to a motion for summary judgment and is granted.

BACKGROUND

The following facts are drawn from the Complaint filed on December 17, 2010, the documents integral to the Complaint, and undisputed facts. RPI, a New York-based corporation organized under the laws of the state of New York, provides temporary and permanent employment staffing services in various industries including health care.

1. 2004 Departure of Employees

On or about September 2, 2004, three RPI employees submitted letters of resignation (the "Former Employees"). RPI quickly discovered that prior to their departure, the Former Employees had stolen confidential customer lists from RPI's medical placement business. On September 30, RPI filed a complaint in New York State Supreme Court (the "New York Complaint") against the Former Employees and the agencies for which they went to work, seeking both injunctive relief and damages (the "State Court Action"). Additionally, RPI filed an Order to Show Cause supported by the affidavit of its Vice President, Barry Cohen (the "Cohen Affidavit"), requesting

2

immediate injunctive relief.  Together, the New York Complaint
and Cohen Affidavit alleged that in August and September 2004,
the Former Employees "conspired to leave RPI and go to work for
a competitor and to take for their benefit and the benefit of
their new employer, confidential information and trade secrets
from RPI."

On December 17, 2008, RPI filed the affidavit of Vice
President Mindi Derry ("Derry") in opposition to the Former
Employees' motion for partial summary judgment in the State
Court Action.  Derry testified that "immediately" after learning
of the Former Employees' resignation on September 2, she "went
to the RPI Long Island office and found that [two] defendants .
. . had 'cleaned out' their desks and that the records and
documents with which they worked in contacting health
professional and health facilities were all missing."  Derry
explained that in the following months, she and other RPI
employees "visited all of RPI's customers and clientele in order
to try to preserve RPI's business relationship with them."
Despite these efforts, Derry stated that

> RPI's business not only took an immediate severe drop
> but the balance ebbed away over the next several
> months.  What had taken RPI nearly three years to
> create literally disappeared overnight. . . .
>
>      It was not just financially impossible for RPI
> to rebuild its business from scratch, but it was
> equally unfeasible to find replacement health workers
> in a short period of time that had previously taken

two years to accomplish.  Thus, [RPI] had no choice
other than to terminate its medical staffing business
operations in March of 2005.

(Emphasis supplied.)

2. The 2006 Policy

In 2006, Hartford issued RPI a CrimeShield Policy for

Mercantile Entities (the "Policy") for the period beginning July

31, 2006 through July 31, 2008 (the "Policy Period").[1]  The

Policy's "Consideration Clause" provides, in relevant part:

> In exchange for the payment of premium and subject to
> the Declarations, Insuring Agreements, Exclusions,
> General Conditions, Definitions and terms of this
> Policy, we will pay for loss which you sustain
> resulting directly from acts committed or events
> occurring at any time and discovered by you during the
> Policy Period shown in the Declarations . . . .

General Condition H, titled "Discovery" (the "Discovery

Clause"), further states:

> 1. We will pay for loss which you sustain through
>    acts or events committed or occurring at any time
>    and which are discovered by you during the Policy
>    Period . . . .
>
> 2. Discovery of loss occurs when you first become
>    aware of facts which would cause a reasonable
>    person to assume that a loss covered by this
>    Policy has been, or may be incurred even though
>    the exact amount or the details of the loss may
>    not then be known.

(Emphasis supplied.)

---

[1] The Policy was initially in effect for the period beginning
July 31, 2006 until cancelled.  The Policy Period was then
adjusted by endorsement to end on July 31, 2007.  A subsequent
renewal endorsement extended the Policy Period to July 31, 2008.

Attached to the Policy is an endorsement titled "Employee Theft Coverage -- Trade Secrets for Temporary Help Agencies" (the "Endorsement"), which "adds an additional Insuring Agreement to the Policy," and provides that Hartford "will pay for 'loss' of 'Trade Secrets' by 'theft.'"[2]  The Endorsement obligated RPI to give Hartford "notice as soon as possible of any 'loss' of the type insured under this Insuring Agreement." The Endorsement also specified certain terms "additional" to those in the Policy, including a definition of "loss" to mean:

> the actual economic loss (net revenues derived from specific customer accounts minus expenses) realized by you for any customer accounts lost directly due to "theft" by an "employee."

Finally, the Endorsement replaced the Policy's General Condition concerning valuation of loss with a specialized provision, stating in relevant part, that

> "Loss" involving "theft" by an "employee" of your customer list . . . shall be determined by the economic loss realized on a detailed customer level for the first six (6) months following the date of "theft" of the customer list and comparing said economic loss against economic gain, if any, on a detailed customer level for the comparable six (6) month period from the prior calendar year.  The period for measuring the amount of such "loss" shall be limited exclusively to this time period.

_____

[2] The Endorsement defined "theft" to mean "the act of stealing by an employee" the insured's "customer or employee/applicant list and the subsequent distribution or sale of such list to third parties or the retention of such list and use by such employee for personal pecuniary gain."

(Emphasis supplied.)

3. 2007 Notice of Claim

     In May 2007, RPI sent Hartford an initial notice of loss.

RPI completed and signed a Proof of Loss certifying that the

"loss was discovered in May 2007."[3]  In a letter dated October

22, 2007 (the "October 22 Letter"), Hartford denied RPI's claim

on four "independent" bases:

> (1) RPI did not discover this loss during the Policy
> period; (2) the Policy's suit limitations period has
> expired; (3) RPI's notice of loss is untimely under
> the Policy; and (4) RPI's proof of loss is untimely
> under the Policy.

Hartford further explained that

> [c]entral to [its] coverage position is its
> conclusion, based upon the [Cohen] Affidavit and the
> filing of the [New York Complaint] in the fall of
> 2004, that RPI discovered this loss, as defined in
> the Policy, no later than September 30th, 2004, the
> date of the Affidavit.  In so concluding, Hartford
> does not agree with the "May of 2007" discovery dates
> set forth in the Proof of Loss.

(Emphasis supplied.)

     By letters dated April 23 and August 21, 2008, RPI

challenged the denial.  Hartford then requested information

---

[3] Attached to the Proof of Loss was a document titled "Period
Comparison," which compared RPI's net profit with respect to
each of its Medical Placement Business customers for the six
month period immediately succeeding the Former Employees'
resignation with its net profit from each of these customers for
the comparable six month period from the previous calendar year.
The document compared net profits from September 1, 2003 to
February 28, 2004 with those from September 1, 2004 to February
28, 2005.  The Period Comparison indicates that the loss in net
profit was $394,549.

relating to RPI's calculation of its alleged loss.  On November 3, 2008, RPI and Hartford entered a "Non-Waiver Agreement" pursuant to which Hartford committed to "conduct [an] additional investigation concerning the facts and circumstances of the transactions that are the subject of [RPI's] . . . Proof of Loss."  The parties also agreed, however, that "such investigation shall be on a non-waiver basis and without prejudice or waiver of the rights, remedies or defenses of either party and subject to a reservation of each party's respective rights, remedies and defense under the Policy at law and equity."

    RPI commenced this action on July 8, 2010, and on December 17, it filed the amended complaint (the "Complaint").  On January 14, 2011, Hartford filed a motion to dismiss.  The motion became fully submitted on April 1.


## DISCUSSION

    Hartford has moved to dismiss the Complaint.  It contends that RPI "discovered" the loss caused by the Former Employees prior to the start of the Policy Period.  As a result, RPI's claim is not covered by the Policy.[4]  Hartford has attached

---

[4] Defendant further argues, inter alia, that this action is time barred since it was not commenced within two years after "discovery of loss" pursuant to the Policy's General Condition on "Legal Action Against Us"; and, that the Complaint should be

exhibits to its motion, principally from the State Court Action. RPI has also offered documents and testimonial evidence.

"'If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.'" Hernandez v. Coffey, 582 F.3d 303, 307 (2d Cir. 2009) (quoting Fed. R. Civ. P. 12(d)). A district court must ordinarily give notice to the parties before converting a motion to dismiss into a motion for summary judgment, but a party "is deemed to have notice that a motion may be converted . . . if that party should reasonably have recognized the possibility that such a conversion would occur." Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004) (citation omitted); see also Hernandez, 458 F.3d at 307. Where a represented party attaches to its opposition to a motion to dismiss "extensive materials that were not included in the pleadings," it "plainly should [be] aware of the likelihood of" conversion, and "cannot complain that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support their" position. Sira, 380 F.3d at 68; see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 573 (2d Cir. 2005).

---

dismissed since RPI failed to provide Hartford with notice of its alleged notice "as soon as possible" as is required by the Endorsement. It is not necessary to reach these additional arguments supporting dismissal.

In light of the parties' extensive factual submissions,
Hartford's motion is converted to one seeking summary judgment.

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P.  56(c).  The
moving party bears the burden of demonstrating "the absence of a
genuine issue of material fact."  Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  In making this determination, the court
must "construe all evidence in the light most favorable to the
nonmoving party, drawing all inferences and resolving all
ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d
732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and
cannot "rely merely on allegations or denials" contained in the
pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554
F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere
speculation or conjecture as to the true nature of the facts to
overcome a motion for summary judgment," as "[m]ere conclusory
allegations or denials cannot by themselves create a genuine
issue of material fact where none would otherwise exist."  Hicks
v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Both parties assume that New York law applies, but do not directly address the choice-of-law issue.  "Federal courts sitting in diversity look to the choice-of-law rules of the forum state."  Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).  "Under New York choice of law rules . . . where the parties agree that New York law controls, this is sufficient to establish choice of law."  Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011). Such agreement may be implicit.  Id.  The parties' briefs assume that New York law controls.  Therefore, under the New York choice-of-law rule, New York law applies.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract."  Fed. Ins. Co., 639 F.3d at 567 (citation omitted).  An insurance contract is ambiguous if its terms are "susceptible of two reasonable interpretations."  Id. (citation omitted).  By contrast, an insurance contract "is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion."  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011); accord Broad St., LLC v. Gulf Ins. Co., 37 A.D.3d 126, 131 (N.Y. App. Div. 2006) (citation omitted).  "The question of whether the

language of a contract is clear or ambiguous is one of law, and

therefore must be decided by the court."  Fed. Ins. Co., 639

F.3d at 568 (citation omitted).  "Mere assertion by one that

contract language means something to him, when it is otherwise

clear, unequivocal and understandable when read in connection

with the whole contract, is not in and of itself enough to raise

a triable issue of fact."  Broad St., LLC., 37 A.D.3d at 131

(citation omitted).

The Policy states that Hartford "will pay for loss . . .

from acts . . . discovered . . . during the Policy Period."

(Emphasis supplied.)  "Discovery," in turn, is defined to mean

when the insured "first become[s] aware of facts which would

cause a reasonable person to assume that a loss covered by this

Policy has been, or may be incurred even though the exact amount

or the details of the loss may not then be known."  (Emphasis

supplied.)

Hartford is entitled to a judgment in its favor.  Pursuant

to the unambiguous terms of the Policy, RPI's claim is not

covered.  The Former Employees left RPI in early September 2004.

RPI concedes that it became "aware of its Former Employees'

theft in the time period after it occurred."  On September 30,

2004 -- almost two years before the Policy Period commenced --

RPI filed the State Court Action seeking both injunctive relief

and damages arising from the Former Employees' "conspir[acy] to

leave RPI and go to work for a competitor and to take for their

benefit and the benefit of their new employer, confidential

information and trade secrets from RPI."  Additionally, in

affidavits filed in the State Court Action, RPI employees

testified that they "immediately" took steps to assess the scope

of the harm they suspected the Former Employees had caused by

their theft and that despite RPI's best efforts to mitigate

these damages, in March 2005 -- more than a year prior to the

start of the Policy Period -- RPI "had no choice other than to

terminate its medical staffing business."

    RPI offers three principal reasons why the defendant's

motion should be denied.[5]  RPI first contends that since the

Endorsement defines "loss" as "actual economic loss," RPI could

not have "discovered" its loss until it could compare its

economic performance from before and after the theft.  RPI's

argument fails because it conflates discovery of loss with

valuation of loss, two concepts which are distinct under the

---

[5] RPI also invokes the "doctrine of equitable estoppel" and
asserts that by reopening RPI's file, Hartford either "waived"
or "relinquished the grounds upon which its original denial" was
based.  Hartford having denied RPI's claim, it is not estopped
from asserting the Policy's "time for suit clause[]."  See
Enter. Engineering, Inc. v. Hartford Fire Ins. Co., 04 Civ. 5018
(DLC), 2004 WL 2997857, at *3 (S.D.N.Y. Dec. 23, 2004).  RPI's
reference to waiver is similarly misplaced.  Nothing in the
record indicates that Hartford knowingly relinquished any
defense and the Non-Waiver Agreement evinces Hartford's intent
to preserve all possible defenses.

Policy and the Endorsement.

Next, RPI suggests that the Policy's definition of "discovery" conflicts with the Endorsement's definition of "loss," and that the Endorsement "supersedes" the Policy.[6]  There is, however, no conflict between the Endorsement and the Policy. The Endorsement modifies the Policy by adding a supplemental "Insuring Agreement," but it does not replace, alter or even refer to the Policy's Discovery Clause.  After listing additional provisions and terms which replace other sections of the Policy, the Endorsement explicitly states that "[a]ll other terms and conditions [of the Policy] remain unchanged."  "[I]n construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement."  Richner Commc'ns, Inc. v. Tower Ins. Co., 72 A.D.3d 670, 671 (N.Y. App. Div. 2010) (citing Cnty. of Columbia v. Cont'l Ins. Co., 83 N.Y.2d 618, 628 (1994)).

Finally, RPI argues that for the purpose of this motion,

---

[6] Even under the plaintiff's definition of discovery (equating discovery with actual loss), discovery must have occurred prior to the beginning of the Policy Period on June 31, 2006.  RPI's medical placement division ceased operating in February/March 2005.  Based on RPI's allegation that the theft occurred in early September 2004, the period for measuring a "loss" under the Endorsement's Valuation clause terminated six months later, in February 2005.

the Court must assume the truth of the statement in both its Complaint and its Proof of Loss that the loss was "discovered" in May 2007.  This argument mistakes a legal conclusion for a statement of fact.  RPI does not dispute that trade secrets were stolen in early September 2004 and nothing in the Complaint suggests that RPI was unaware of the theft, or its potential to harm the company, until May 2007.  Thus, RPI's assertions in its Proof of Loss and Complaint are based on its interpretation of the term "discover."  For the reasons discussed above, RPI's interpretation of the term "discover" is rejected.  The parties' dispute concerning the meaning of an unambiguous contract term does not create a genuine dispute of fact.  See Broad St., LLC, 37 A.D.3d at 131.

## CONCLUSION

The defendant's January 14, 2011 motion to dismiss, converted to a motion for summary judgment, is granted.  The Clerk of Court shall enter judgment for the defendant and close the case.

SO ORDERED:

Dated:    New York, New York
          June 29, 2011

_____
                    DENISE COTE
          United States District Judge

14